## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MA EQUIPMENT LEASING I LLC,
91 Wilshire Blvd, Suite 1750
Los Angeles, California 90017

    and

MA 265 NORTH HAMILTON ROAD LLC,
265 North Hamilton Road
Columbus, Ohio 43213-1332

        Plaintiffs,

    vs.

LYNN TILTON,
3575 South Ocean Boulevard
Highland Beach, Florida 33487

    and

PATRIARCH PARTNERS, LLC,
32 Avenue of the Americas, 17th Floor
New York, New York 10013

    and

PATRIARCH PARTNERS MANAGEMENT
GROUP, LLC,
4055 Valley View Lane, Suite 500
Dallas, Texas 75244

    and

PATRIARCH PARTNERS XIV, LLC,
Corporate Service Company, Registered Agent
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

    and

LD INVESTMENTS, LLC,
2711 Centerville Road, Suite 400

Case No. 2:09-cv-00880-MHW-NMK

Judge WATSON

Magistrate Judge KING

JURY DEMAND ENDORSED HEREON



Wilmington, Delaware  19808              :
                                         :
    and                                  :
                                         :
JOHN HARRINGTON,                         :
10 Kingsbury Street                      :
Needham, Massachusetts  02492            :
                                         :
    and                                  :
                                         :
ZOHAR II 2005-1, LIMITED,                :
32 Avenue of the Americas                :
New York, New York  10013,               :
                                         :
    and                                  :
                                         :
JOHN DOE DEFENDANTS 1-10 ,               :
Addresses unknown,                       :
                                         :
            Defendants.

## SECOND AMENDED COMPLAINT

## INTRODUCTION

1.     This case arises from a course of egregious, unethical and wrongful conduct

undertaken by Defendant Lynn Tilton, and her web of entities and related affiliates she

controls including, but not limited to, LD Investments, LLC, Patriarch Partners, LLC,

Patriarch Partners Management Group LLC, Patriarch Partners XIV, LLC, Zohar II 2005-1

Limited and Tilton's cohort, John Harrington (collectively, "Defendants") in their purchase

of the distressed assets of a company known as Zohar Waterworks LLC d/b/a Tri-Palm

International ("Zohar Waterworks") formerly a Columbus, Ohio based manufacturer of

water coolers and related products.

2.     The Defendants have systematically, deliberately, and covertly directed,

funded and operated Zohar Waterworks to hedge the inherent risks of their respective

investments in Zohar Waterworks.  In so doing, Defendants negotiated various leases with

Plaintiffs MA Equipment Leasing I, LLC ("MA Equipment") and MA 265 North Hamilton Road, LLC ("MA 265", collectively "Plaintiffs") that they never intended to allow Zohar Waterworks to perform and, in fact, affirmatively directed Zohar Waterworks to breach said leases.

3.      In this case, Defendants' arrogance and flagrant disregard for the law damaged Plaintiffs, who were in a prior business relationship with the entity that preceded Zohar Waterworks.   Defendants intentionally interfered with Plaintiffs' contractual relations, negotiated contracts it had no intent of honoring, literally attempted to take Plaintiffs' equipment and machinery to Mexico in the darkness of night to create leverage in negotiations, and employed deceitful business tactics and improper economic duress. Defendants now attempt to hide under the pretext of their various related entities and purported corporate shelters which must not be countenanced.

4.      As explained below, Tilton, LD Investments, Patriarch Partners XIV, LLC and Patriarch Partners' control of Zohar Waterworks was so absolute, pervasive and complete that they made all of the decisions regarding the management, control, finances, and overall operations of Zohar Waterworks and throughout the proceedings below and before the Bankruptcy Court have manipulated the legal system to protect their personal investments.

5.      When Zohar Waterworks breached its respective leases by covertly attempting to take Plaintiff MA Equipment's valuable machinery that Zohar Waterworks was using in its operations to its facility in Mexico, and further failed to honor its contractual obligations under its respective leases, Plaintiffs' filed an action in state court styled as *MA Equipment*

*Leasing  I LLC and MA 265 North Hamilton Road LLC v. Zohar Waterworks, LLC*, Case No. 07 CVH 2297, in the Franklin County Court of Common Pleas, Ohio (the "Zohar Waterworks Action"). This case is not about the collection of the judgment obtained in state court, as asserted by Defendants, but a separate and distinct cause of action against these Defendants for their own wrongful conduct that could not have been brought in the preceding matter.

6.     Plaintiffs are now forced to commence this action to hold Defendants accountable for their wrongful course of conduct throughout the Zohar Waterworks litigation and thereafter.  It was not until after the damages hearing in the state court action that it became clear that Defendants' improper business and litigation tactics allowed them to realize their end result to thwart liability for all of their contractual and legal wrongdoings and to ultimately place the risk of their investment on to the Plaintiffs.

**PARTIES AND JURISDICTION**

7.     Plaintiff MA Equipment Leasing I LLC ("MA Equipment") is a Delaware limited liability company with its principal place of business at 915 Wilshire Boulevard., Suite 1750, Los Angeles, California 90017.  Plaintiff MA Equipment was a citizen of the states of California, Arizona, Colorado, and New York (and reserves the right to claim Alabama citizenship) as of August 25, 2009.

8.     Plaintiff MA Equipment is a private investment firm engaged in the business of leasing industrial equipment.

9.     As of August 25, 2009 MA Equipment had seven different members, with one of those being a limited partnership named Nash Mariposa, Ltd. ("Nash Mariposa").

10.     The six individual members of MA Equipment are, and have been, citizens of the state of California.

11.     Prior to and on August 25, 2009, Nash Mariposa was comprised of approximately twenty-seven limited partners and one general partner, some of which were individuals, trusts, and one incorporated entity.  The individual limited partners of Nash Mariposa are, and have been, citizens of the states of California, Arizona, New York and Colorado.

12.     As of August 25, 2009 the general partner of Nash Mariposa was a citizen of the state of California.

13.     As of August 25, 2009, the trust limited partners of Nash Mariposa all had trustees that are/were citizens of the state of California and had beneficiaries that are citizens of either of the states of Alabama or California.

14.     The incorporated entity that was/is a limited partner of Nash Mariposa is incorporated in California and has a principal place of business in California.

15.     Plaintiff MA 265 North Hamilton Road LLC ("MA 265") is an Ohio limited liability company with its principal place of business at 265 North Hamilton Road, Columbus, Ohio 43213-1332.  Plaintiff MA 265 was a citizen of the states of California, Arizona, Colorado and New York (and reserves the right to claim Alabama and Hawaii citizenship) as of August 25, 2009.

16.     Plaintiff MA 265 is a private real estate investment firm specializing in the leasing of quality industrial real estate.

17.     The member of Plaintiff MA 265 is and has been MA Real Property Holdings I, LLC.  The sole member of MA Real Property Holdings I, LLC is and has been another limited liability company named MA Capital Holdings I LLC ("MA Capital").

18.     On August 25, 2009 MA Capital had approximately forty-two different individuals, trusts, corporations and one limited partnership (Nash Mariposa) as its members.  The individuals who were members of MA Capital on August 25, 2009 are citizens of California or New York.

19.     The trusts who are members of MA Capital all have trustees that are citizens of California and beneficiaries that are citizens of the states of California, Idaho, Alabama or Hawaii.  Incorporated entities who are members of MA Capital are all organized in California with principal places of business in California..

20.     The facts regarding MA Capital's member, Nash Mariposa's, citizenship are set forth above in paragraphs 11-15.

21.     Defendant Lynn Tilton ("Tilton") is the Chief Executive Officer, founder and, upon information and belief, majority member and/or shareholder in LD Investments, Patriarch Partners, Patriarch Management, Patriarch XIV and Zohar II (each as defined herein).  Tilton purports to be a citizen of Florida.

22.     Defendant LD Investments, LLC ("LD Investments") is a Delaware limited liability company.  LD Investments purports to be a citizen of Florida, since its sole member is Lynn Tilton, who claims to be a resident of Florida.  LD Investments owns or controls Patriarch Partners (as defined herein).

23.     Defendant Patriarch Partners, LLC ("Patriarch Partners") is a Delaware limited liability company.   Patriarch Partners purports to be a citizen of Florida, since it claims its sole member is LD Investments and the sole member of LD Investments is Lynn Tilton.   Patriarch Partners is, or manages, what is commonly-known as a "vulture fund," meaning it is an investment firm that specializes in identifying and attempting to turn around financially-distressed companies.   Patriarch Partners frequently boasts that the investment funds that Patriarch Partners manages hold assets in excess of $6 billion and include majority and minority ownership positions in more than 70 companies.

24.     Patriarch Partners Management Group, LLC ("Patriarch Management") is a Florida limited liability company.   Patriarch Management's sole member is Zohar Holding, LLC ("Zohar Holding").   The members of Zohar Holding are Lynn Tilton, who purports to be a citizen of Florida, and the Carly J. Tilton Irrevocable Trust, which has as its trustee Lynn Tilton and as its beneficiary Carly J. Tilton, who upon information and belief, is a citizen of New York.   Patriarch Management is ultimately controlled by Lynn Tilton.   Tilton, Zohar Holdings, Patriarch Partners and Patriarch XIV use Patriarch Management to directly supervise and oversee the operations of the companies in their so-called investment "platforms" by, among other things, placing its employees in key executive positions, such as CEO or CFO, so that Patriarch Management can effectively operate and maintain complete control over the companies that Patriarch Partners owns or has an interest.

25.     Defendant Patriarch Partners XIV, LLC ("Patriarch XIV") has as its sole member Zohar Holding, LLC ("Zohar Holding").   The members of Zohar Holding are Lynn Tilton, who purports to be a citizen of Florida and the Carly J. Tilton Irrevocable

Trust, which has as its trustee Lynn Tilton and as its beneficiary Carly J. Tilton, who upon information and belief, is a citizen of New York. Patriarch XIV is ultimately controlled by Lynn Tilton. Patriarch XIV is the collateral asset manager with full investment authority over the assets of Zohar II 2005-1, Limited.

26.     Zohar II 2005-1, Limited ("Zohar II") was created by Lynn Tilton and possibly others to invest in, own and finance Zohar Waterworks. Prior to the events described herein, Zohar II delegated all decisions pertaining to its investments to Patriarch XIV. Zohar II is the sole member of Zohar Waterworks. Zohar II is a citizen of the state of New York as well as the Cayman Islands as Zohar II purports to be an exempted company organized under the laws of the Cayman Islands with its principle place of business as New York, New York. Zohar II is controlled by Patriarch XIV, and ultimately by Lynn Tilton.

27.     Defendant John Harrington ("Harrington") is a Managing Director and employee of Patriarch Management and, as such, also serves as an agent of Zohar Holdings, Patriarch Partners, Patriarch XIV and LD Investments. Harrington claims to be responsible for the management of Patriarch Partners' "Engineering and Manufacturing Platform." Harrington purports to be a citizen of Massachusetts.

28.     John Does 1 through 10 are entities under the control of and/or are affiliates of Patriarch Partners, Patriarch Management, Patriarch XVI and Zohar II and/or have some relationship with Tilton, Zohar Waterworks, Zohar II, Patriarch Partners, Patriarch Management, Patriarch XIV and/or Harrington, and which shared in the management, control and/or financing of Zohar Waterworks.

29.   Jurisdiction over this matter is not proper in Federal Court as there is no diversity of citizenship and it is not subject to bankruptcy jurisdiction under 28 U.S.C. § 1334(b) or 28 U.S.C. § 157.   Rather, subject matter jurisdiction and venue is proper in the Court of Common Pleas of Franklin County, Ohio pursuant to Ohio R. Civ. P. 3(B)(3) and 3(B)(6) because Plaintiffs' claims arise under the laws of the State of Ohio and there are citizens from the same state (New York) on either side of this dispute.   Venue is proper in Franklin County, as Defendants conducted activity that gave rise to the claims for relief in Franklin County and Franklin County is the County in which all part of the claims for relief arose.

## FACTUAL BACKGROUND

30.   In or around February 2005, Plaintiffs MA 265, MA Equipment, and certain of their affiliates entered into a series of transactions with the Oasis Corporation ("Oasis") which were designed to infuse cash for Oasis' operating purposes.   Oasis was a manufacturer of water cooler and water bottling products.   In connection with those transactions, MA 265 agreed to purchase from and lease back to Oasis the real estate which consisted of the corporate headquarters and manufacturing facility that Oasis had previously owned and used in Columbus, Ohio (the "Premises").   Likewise, in connection with those transactions, MA Equipment and Oasis entered into a separate Equipment Purchase Agreement whereby MA Equipment purchased the equipment and machinery of Oasis (the "Equipment") and agreed to lease that Equipment back to Oasis.

31.   In or about June 2005, Oasis was continuing to struggle financially.   As a result, Oasis began to entertain offers to sell its business.   In connection with that effort,

Oasis' board and then CEO, Chris Gurreri ("Gurreri"), had conversations with Tilton about the possibility of Patriarch Partners and its related entities and/or affiliates acquiring the operations and certain assets of Oasis in an Article 9 transaction.

32.     In July and August 2005, Tilton and other Patriarch Partners representatives visited Oasis' operation in Columbus, Ohio to meet with Gurreri and other representatives of Oasis about the proposed transaction and to further conduct initial due diligence in connection with an Article 9 purchase of Oasis' assets .

## I.     Defendants' Creation of Zohar Waterworks

33.     As noted previously, Patriarch Partners is, or manages, what is commonly known as a "vulture fund."  Vulture fund managers Tilton and Patriarch Partners and their related entities specialize in identifying, acquiring and/or investing in the operations and assets of distressed companies.  Their *modus operandi* is to replace management with their own team including, but not limited to, John Harrington, to cut expenses and personnel at all costs.  Although Tilton, LD Investments, Patriarch Partners, Patriarch XIV and Zohar II use a number of different affiliate corporate entities to manage and finance the operations of their acquisitions, at the end of the day those entities are under the complete control of and managed formally and/or informally by Tilton and/or Patriarch Partners and/or LD Investments.

34.     In early August 2005, Tilton and Patriarch Partners began negotiating an Article 9 sale of Oasis' assets and operations with Oasis' board of directors so that they could conclude the same by August 26, 2005.

35.     At that same time, LD Investments, Patriarch Partners, Patriarch XIV, Zohar II and Tilton caused the creation of Zohar Waterworks, which they initially identified as

"Newco," for the purpose of purchasing Oasis' assets in a transaction that would accomplish and complete the sale of Oasis' assets. "Newco" was later officially renamed "Zohar Waterworks LLC" d/b/a "Tri Palm International, LLC."

36.    Zohar Waterworks was funded by affiliates of Patriarch Partners, Patriarch XIV, Zohar II, and other John Doe Defendants, which when the layers are in turn peeled away, were owned, managed and dominated by Tilton.

37.    The officers of Zohar Waterworks did not have the requisite control or authority to conduct business beyond the authority given to them by Tilton and Patriarch Partners. To echo the sworn statement of a former officer of Zohar Waterworks, "nothing is done without Lynn Tilton's approval."

38.    No monies were kept within the corporate structure and most, if not all monies were paid out by Zohar Waterworks upon receipt from Tilton and/or her related funding entities for the strategic reasons common to a vulture capitalist like Defendant Tilton and/or Patriarch Partners here.

39.    Zohar Waterworks functioned completely as a façade for Tilton and her related entities that include but is not limited to the Defendants identified herein above.

40.    On or about August 18, 2005, Tilton and Patriarch Partners individually hired Oasis' CEO, Chris Gurreri, to serve as Zohar Waterworks' CEO and President and to facilitate their purchase of Oasis' assets. When Gurreri refused to serve as figurehead to Tilton and Patriarch Partners, he was replaced with Patriarch Partners own designated CEO John Harrington, an employee of Patriarch Management.

## II.    Tilton's and Patriarch Partners' Negotiation of the Building Leases and the Equipment Lease

41.    During their due diligence of the Oasis operations, Tilton and Patriarch Partners were advised and learned that Plaintiffs owned the Premises and Equipment being utilized by Oasis in its business operations.

42.    Knowing that any investment in Zohar Waterworks would not succeed without the ability to use the Premises and Equipment, Tilton and Patriarch Partners sought to negotiate leases with Plaintiffs for the use of the Premises and Equipment that would be utilized now by Zohar Waterworks once the Article 9 transaction was completed.

43.    To that end, in or about August 2005, Tilton and two other Patriarch Partners representatives, Robert Annas and Douglas Combs, traveled to Columbus, Ohio to negotiate leases for the Premises and Equipment that their new business, Zohar Waterworks, would operate.

44.    During the course of those negotiations in Columbus, Ohio with Plaintiffs, Tilton was the principal negotiator for Zohar Waterworks.  What was supposed to be a negotiation was in actuality Tilton dictating the terms of new lease agreements.  Essentially, Tilton demanded that Plaintiffs agree to reduce the term of the equipment lease from a multi-year lease agreement with Oasis to a one (1) year lease term with a one (1) year option. Likewise, Tilton insisted that the two (2) leases for the Premises where the offices and manufacturing were located would be substantially reduced or she would not allow the transaction to close.

45.    Tilton and/or Patriarch Partners selected, retained and personally worked with counsel for Zohar Waterworks.  At the direction of Patriarch XIV, Zohar II, an entity

created by Tilton and/or Patriarch Partners, funded the engagement and payment of counsel for Zohar Waterworks.  As Patriarch XIV directed, Zohar II later provided monies when necessary to pay certain business expenses.

46.     Neither Zohar Waterworks nor any of its officers or directors (if any) had a role in the negotiation of the Equipment Lease or the Building Leases, as its CEO at the time and only employee, Gurreri, was not involved and never saw, read or reviewed those documents prior to being advised by Tilton to execute the same.  Rather, Tilton, through Patriarch Partners and other agents under her control, negotiated these Leases.  Indeed, the Leases were originally prepared to be executed by Tilton as an agent of Zohar II, and not by Gurreri.

47.     During the course of the due diligence of Oasis' operations and their analysis of the finances of the potential new business, Tilton and Patriarch Partners unilaterally determined that they would move all equipment and operations from its facility in Columbus, Ohio to Monterrey, Mexico.  These Defendants knew and understood at this time that they would ultimately terminate and breach the leases that they were negotiating with Plaintiffs.

48.     When Tilton and Patriarch Partners negotiated the leases for the Premises, they were fully aware of the condition of the Premises.  Indeed, Tilton and her advisors toured the facility and personally observed the same.  The problems at the leased premises were obvious, substantial and numerous.  Tilton and her entourage saw dozens of tarps strung throughout the ceiling of the manufacturing operations to catch water from the leaking roof.  These tarps were in turn connected by hoses to deposit water from the leaking

roof to 55 gallon drums which were emptied when they became full. The damage from the water pouring into the building was obvious and noted by Tilton and Patriarch Partners, as well as by Gurreri, Tilton's hand-picked CEO that formerly was the CEO of Oasis prior to Tilton appointing him to work for her and her related entities at Zohar Waterworks.

49.   During the course of the negotiations for the Premises and the Equipment, Tilton and Patriarch Partners agreed that Zohar Waterworks would assume full responsibility for the repair and maintenance of the Premises during the Leases' term and, most importantly, at the conclusion of the Building Leases. In this and in the commercial lease context, a lease which requires a commercial tenant to assume full responsibility for the repair, maintenance and replacement of a commercial property is commonly known as a "net" or "triple net" lease.

50.   As sophisticated commercial parties, Tilton and Patriarch Partners were familiar with the concept of a "net" or "triple net" lease. Indeed, in connection with their acquisition of and/or investment in other companies, Tilton and Patriarch Partners were familiar with and have previously negotiated these types of commercial leases.

51.   Here, during the course of negotiations, Tilton and Patriarch Partners were advised and understood that the Equipment Lease prohibited removal of the Equipment owned by Plaintiff MA Equipment from the Columbus facility without Plaintiff MA Equipment's prior written consent.

52.   Despite the contractual obligations Tilton and Patriarch Partners negotiated and their knowledge that Zohar Waterworks could not honor those provisions because of their plans to move the operations to Mexico, Tilton and Patriarch Partners nevertheless

authorized and directed the CEO of Zohar Waterworks to execute the Leases.  Simply put, at the time they negotiated these Leases, Tilton and Patriarch Partners had no intention of permitting Zohar Waterworks to comply with and abide by the terms of the Leases as they related to the maintenance and repair of the Premises and as to the movement of Plaintiffs' Equipment.

53.    On August 26, 2005, Zohar Waterworks' CEO, Gurreri, received direction from Tilton and/or Patriarch Partners to sign the Equipment Lease and the Building Leases. (Copies of the Leases are attached hereto as Exhibits A, B and C).

## III.        Defendants' Interference with the Equipment Lease

54.    In or around March 2006, Zohar Waterworks publicly announced its intention to close its manufacturing facility and operations in Columbus and transfer said operations to a facility in Monterrey, Mexico.

55.    Thereafter, contrary to their contractual obligations, at the direction of Tilton, LD Investments, Patriarch and Patriarch XIV, Zohar Waterworks covertly began transporting the Equipment owned by Plaintiff MA Equipment to its Mexican facility.

56.    In or around June 2006, due to their dissatisfaction with the financial performance of Zohar Waterworks and the current CEO Gurreri, Tilton, LD Investments, Patriarch Partners, Patriarch XIV, Zohar II and Patriarch Management assigned Harrington to evaluate and oversee Zohar Waterworks' operations.

57.    At the same time, Tilton advised Gurreri that the financial performance of Zohar Waterworks would have to improve significantly or he would be terminated.

58.   In or around November 2006, as Zohar Waterworks' financial performance continued to plummet, Gurreri resigned before Tilton and Patriarch Partners could terminate him.

59.   In December 2006, Harrington was assigned by Tilton to his first term as an "interim" CEO of Zohar Waterworks.   While serving as the interim CEO, Harrington remained an employee of Patriarch Management and as an agent of Tilton, Patriarch Partners, Patriarch XIV and Zohar II.   Although serving as interim CEO of Zohar Waterworks, Harrington's allegiance was indisputably to Tilton, Patriarch Partners, Patriarch Management, Patriarch XIV and Zohar II and at all relevant times, he received all orders and instructions from them.

60.   In December 2006, Plaintiff MA Equipment received the requisite authority from Zohar Waterworks and thus entered into negotiations with several auction companies to sell Equipment that was not being used by Zohar Waterworks.

61.   In early January 2007, Plaintiff MA Equipment again confirmed with Zohar Waterworks and Harrington that it could sell the unused Equipment, pursuant to the Equipment Lease, at an auction that was to occur in February 2007.   Relying on that assent, MA Equipment entered into a contract to auction the unused Equipment.

62.   At this time, Harrington fully understood that Zohar Waterworks had significant financial exposure under the Building Leases.   The month before, on or about December 15, 2006, Harrington had received a letter from Plaintiff MA 265's counsel advising him that Zohar Waterworks would be responsible for substantial repairs in excess of $4,000,000 for the Premises.   After reviewing the Building Leases and after conferring

with Tilton, Patriarch Partners and counsel, Harrington concluded that Zohar Waterworks would in fact be responsible for those repairs and the restoration of the Premises under the Building Leases.

63.     In addition, Harrington concluded there were other terms in the Building Leases and the Equipment Lease that he considered unfavorable to Zohar Waterworks.  For example, Harrington felt that Zohar Waterworks was paying more than it should for utilities under the Building Leases and that, under the Equipment Lease, it would still be paying rent for the unused Equipment that would be sold at the upcoming auction.

64.     In January 2007, Harrington again reviewed the Equipment Lease and confirmed that Zohar Waterworks was required under Paragraph 25 of the Equipment Lease to pay Plaintiff MA Equipment almost $3,600,000 (subject to any reductions from the auction) if Zohar Waterworks wanted to purchase the Equipment that it considered critical to its operations.

65.     Harrington considered various provisions of the Equipment Lease, negotiated by Tilton and Patriarch Partners, not to be advantageous to the financial interests of Tilton, LD Investments, Patriarch Partners and Patriarch XIV.  Indeed, Harrington boasts that he would not have signed the Equipment Lease had it been presented to him for execution by Tilton and Patriarch Partners.

66.     Harrington reviewed and was familiar with Paragraph 26 of the Equipment Lease.  Paragraph 26 specifically addresses the sale of unused Equipment and imposed upon Zohar Waterworks the duty to "reasonably cooperate" in connection with any sale or auction of unused Equipment.

67.    In late January 2007, at the same time that Harrington reviewed the Equipment Lease and the Building Leases and learned that there were terms that he deemed unfavorable to Zohar Waterworks, Zohar Waterworks decided it now wished to keep certain Equipment that it had previously advised MA Equipment was available for sale.

68.    After providing MA Equipment with the requisite authorization to sell certain equipment at auction, Harrington changed his mind for no other purpose but to create leverage in an attempt to re-negotiate the Leases he found to be unfavorable to Defendants.

69.    Harrington, both personally and as an agent of Tilton, LD Investments, Patriarch Partners, Patriarch Management, Patriarch XIV and Zohar II, now saw an opportunity to coerce Plaintiffs into renegotiating the terms of the Building Leases and Equipment Lease.

### A.    Harrington Threatened to "Blow Up" the Auction And Unlawfully Attempted, In the Dead of Night, to Remove Plaintiff's Equipment To Mexico

70.    As the February 20, 2007 auction approached, a series of conference calls were held on Thursday, February 8, 2007, between representatives of Plaintiff MA Equipment, the auctioneer retained to sell the unused Equipment, and Zohar Waterworks. The purpose of those conference calls was to finalize certain issues regarding the auction, including the final determination of what, if any, additional Equipment Zohar Waterworks wanted to be removed from the auction.

71.    At this time, Harrington knew that the auction was scheduled to begin Tuesday, February 20, 2007, as advertisements and brochures promoting the auction had been circulated throughout the United States. Indeed, Harrington was also aware that the Equipment that Zohar Waterworks belatedly wished to keep was now featured prominently

in certain of those brochures, with some of that Equipment even on the cover of the brochures.  Finally, Harrington was advised and understood that Plaintiff MA Equipment had entered into a contract with an auctioneer to sell the unused Equipment.

72.    Harrington used the conference call to aggressively insert his objections to the Building Leases and to extort concessions from Plaintiffs MA Equipment and MA 265.

73.    During the call, Harrington repeatedly threatened that he was "going to blow up the auction" if Plaintiff MA Equipment did not accede to the changes he wanted to make in the respective Leases.  Harrington went so far as to purposely lie and to further threaten "locking out" the auctioneers and any bidders arriving to bid on the Equipment if the Leases were not modified.

74.    With the support and authority of defendants, Harrington advised that the auction would not go forward unless the Building Leases' issues were resolved favorably to Zohar Waterworks.

75.    Remarkably, with the authorization and knowledge of Defendants, Harrington decided to "up the ante" and instructed Zohar Waterworks to immediately undertake efforts to surreptitiously transport the Equipment that was owned by MA Equipment to Zohar's facility in Mexico.

76.    Over the course of the next week, Harrington failed to advise Plaintiff MA Equipment that he had given the directive to move MA Equipment's property and machinery to Mexico.  Instead, Harrington insisted that Plaintiffs MA Equipment and MA 265 renegotiate their respective Leases as a condition of the auction going forward.

77.     In connection with that effort and to create more pressure on Plaintiffs to bend to his demands, with the knowledge of Defendants Tilton, Patriarch Partners, LD Investments, and Patriarch XIV, Harrington continued to deceive Plaintiff MA Equipment about a number of material matters. Specifically, Harrington purposely misrepresented to Plaintiffs a conversation in which Harrington claimed that he notified the auctioneer that the auction would not go forward. In the Zohar Waterworks Action, Harrington later admitted that this conversation never took place and that he was not being truthful with Plaintiffs about the communications he was having with the auctioneers.

78.     Likewise, despite repeated requests from Plaintiff MA Equipment prior to the proposed auction for Zohar Waterworks to identify any and all equipment that it would need in its operations so that said equipment would not be auctioned, Harrington refused to identify and/or disclose the Equipment that was utilized by Zohar Waterworks so that the same could be covertly transported to Mexico.

B.      **The Litigation Regarding the Equipment Lease**

79.     In light of the threats, deceit and other unlawful misconduct of Harrington, MA Equipment sought the state court's assistance to compel Zohar Waterworks' cooperation with the auction. That case, captioned *MA Equipment Leasing I LLC, et al. v. Zohar Waterworks LLC,* Case No. 07 CVH 02 2297 was ultimately assigned to the Honorable Judge John Bessey. On Friday, February 16, 2007, MA Equipment filed a request for a temporary restraining order (TRO) to ensure that the auction went forward. During the course of the TRO, MA Equipment discovered for the first time that Zohar Waterworks had improperly removed Equipment to be sold at the auction from the Columbus facility and

that the Equipment was on trucks now speeding to Zohar Waterworks' facility in Mexico.

80.    On Friday, February 16, 2007, a Temporary Restraining Order was issued, directing Zohar Waterworks to return the Equipment to the Columbus facility for the auction. The trucks carrying the Equipment were turned around in Texas only as a result of the state court's order.

81.    On February 16, 2007, due to the unlawful conduct of Harrington, Plaintiff MA Equipment terminated the Equipment Lease and undertook proceedings to secure the repossession of its Equipment.

82.    On April 17, 2007 a Preliminary Injunction hearing was commenced. During that hearing, Plaintiff MA Equipment and Zohar Waterworks entered into a partial settlement whereby Zohar Waterworks purchased all of the Equipment from Plaintiff MA Equipment. The funding for that settlement was provided by Defendant LD Investments, Patriarch Partners, Patriarch XIV and Zohar II at the direction and with the authority of Tilton.

83.    In September 2008, after hearing the testimony of witnesses and the presentation of other evidence, Judge Bessey found that Zohar Waterworks had materially breached the Equipment Lease, that Harrington had been responsible for those breaches, and that Plaintiff MA Equipment was entitled to its attorneys' fees.

84.    In February 2009, after considering evidence and testimony, Magistrate Timothy Harildstadt awarded in a non-final order approximately $591,000 in reasonable attorneys' fees and costs to Plaintiff MA Equipment.

IV.        **Defendants' Interference with the Building Leases**

85.    Under Paragraphs 7.1(a) and 7.1(b) of the Building Leases, Zohar Waterworks was required to maintain the Premises, Utility Installations, and Alterations in good order, condition and repair, and for procuring and maintaining service contracts for maintenance and improvements installed on the Premises.

86.    Under Paragraph 7.6 of the Building Leases, Zohar Waterworks was required to provide Plaintiff MA 265 with certificates every year certifying that the Premises (i) are in good and safe condition and repair, and (ii) are and have been maintained in good order, repair and conditions consistent with maintenance procedures and standards which would generally be applied by commercially reasonable operators.

87.    Under Paragraph 7.4(c) of the Building Leases, Zohar Waterworks was required to "surrender the Premises" "in good operating order, condition and state of repair."

88.    As noted previously, one of the most substantial problems with the Premises was the poor condition of its roof.  Under the unambiguous language of Paragraphs 7.1(a) and 7.2 of the Building Leases, Zohar Waterworks (as Lessee) was responsible for the repair and maintenance of the Premises, including the roof, and Plaintiff MA 265 (as Lessor) had "no obligation, in any manner whatsoever, to repair, maintain or replace all or any portion of the Premises . . . ."

89.    The poor condition of the roof was common knowledge and visible to all who visited the Premises.  Indeed, Zohar Waterworks' own maintenance manager conceded that the roof "was deteriorating rapidly" because "you couldn't stop the water" and the "water

accelerates" the decline of the roof. The tarps and barrels used to route the water leaking through the roofs were used continuously throughout Zohar Waterworks' tenancy at the Premises.

90.     At all times, Zohar Waterworks was fully aware of its responsibility under the Lease that Tilton and Patriarch Partners negotiated for the Premises. In fact, immediately after execution of the Building Leases, Zohar Waterworks secured numerous bids for the replacement of the roof.

91.     Despite its clear obligation to do so, Defendants never directed Zohar Waterworks to undertake the full necessary repair and maintenance obligations imposed upon it under the Building Leases.

92.     On December 15, 2006, Plaintiff MA 265 sent a certified letter to Harrington advising him of Zohar Waterworks' failure to comply with the Building Leases. The Defendants understood and knew that it would cost in excess of $4,000,000 to repair and restore the Premises to the requisite good operating order, condition and state of repair.

93.     After reviewing the Building Leases and after consulting with counsel and the other Defendants, Harrington understood that Zohar Waterworks was in fact obligated to repair and restore the Premises under the Building Leases.

94.     Notwithstanding this knowledge, Harrington continued to consult with Tilton and certain other Defendants and specifically directed Zohar Waterworks not to comply with its obligations under the Building Leases to repair and restore the Premises to the requisite "good operating order, condition and state of repair" required under Paragraphs 7.1(a) and (b) of the Building Leases.

95.    Indeed, Harrington specifically advised Zohar Waterworks employees not to perform any repairs until the litigation between Plaintiffs and Zohar Waterworks was over – an order from Tilton, LD Investments, and Patriarch Partners – that effectively meant that Zohar Waterworks was to ignore its clear obligations under the Building Leases and to do nothing to repair the Premises as it moved all operations to Mexico.

96.    In the state court litigation, Plaintiff MA 265 moved for summary judgment and for a finding that Zohar Waterworks was responsible for the repair and maintenance of the Premises under the Building Leases.

97.    On or about December 4, 2007, Judge Bessey granted summary judgment in favor of Plaintiff MA 265 and found that Zohar Waterworks materially breached its obligations to repair and maintain the Premises under the Building Leases.

98.    In April and May 2008, a trial was held to determine the extent of Plaintiff MA 265's damages arising from Zohar Waterworks' failure to perform under the Building Leases.  In May 2009, Judge Bessey found that Plaintiff MA 265 had been damaged in excess of $5,740,000.

**V.          Defendants' Domination and Control of Zohar Waterworks**

99.    As noted previously, Defendants Tilton, LD Investments, Patriarch Partners, Patriarch XIV, Zohar II and the John Doe Defendants created Zohar Waterworks in August 2005, negotiated the Building Leases and Equipment Lease on Zohar Waterworks' behalf, and have been Zohar Waterworks' primary source of funding since its creation.

100.    At all relevant times, Defendants Tilton, LD Investments, Patriarch Partners, Patriarch XIV, Zohar II, the John Doe Defendants, Patriarch Management and Harrington have completely controlled and dominated the senior management of Zohar Waterworks,

including the selection and hiring employees of Defendants' consultants to serve as CFO, by terminating at least two CEOs, and by inserting Harrington as interim CEO on at least two distinct occasions.

101.    At all relevant times, Defendants Tilton, LD Investments, Patriarch Partners, Patriarch XIV, Zohar II, the John Doe Defendants, Patriarch Management and Harrington have made the decisions on the finances and capital expenditures of Zohar Waterworks. Indeed, Harrington was responsible for any capital expenditures and was responsible for making decisions on any major repairs to the Premises.

102.    Throughout the course of the Zohar Waterworks Action with Plaintiffs, Tilton and Harrington, directed and controlled Zohar Waterworks' litigation strategy, selected and hired counsel and that they have collectively and/or individually made all decisions concerning Zohar Waterworks' defense.  Defendant Patriarch XIV controlled the "purse strings" and at Tilton's direction, directed the expenditures preceding and during the course of the Zohar Waterworks Action.

## VI.    Defendants' Delay of the Zohar Waterworks Action to their Personal Benefit

103.    Yet another compelling example of Defendants' abusive and reprehensible behavior involves their control and domination of the litigation strategy in the Zohar Waterworks Action.

104.    Defendants' directives and control in the Zohar Waterworks Action were purely motivated by their desire to protect their own investments in Zohar Waterworks.  In fact, Defendants purposely sought to delay the Zohar Waterworks Action to secure time to perfect their security interests in their investments in Zohar Waterworks.

105.    On or about August 30, 2005, Defendants, though this agreement, sought to secure their investment interests in Zohar Waterworks in UCC filings.

106.    On February 16, 2007, Plaintiff MA Equipment commenced the Zohar Waterworks litigation.   On March 1, 2007, Plaintiff MA 265 joined as a proper party in that action.

107.    Plaintiffs' initiation of the Zohar Waterworks Action caused Defendants to realize that their August 2005 UCC filings were improperly filed which, if not corrected, would result in Defendants having an unsecured interest in Zohar Waterworks.

108.    Upon realizing these errors, Defendants through their agent acted to re-file their UCC statements on March 31, 2008.   As a result, Defendants' interest remained unperfected until March 31, 2009.

109.    In other words, if Zohar Waterworks filed for bankruptcy prior to March 31, 2009, Defendants' security interests would not have been perfected.

110.    Nonetheless, Defendants knew a judgment against Zohar Waterworks was imminent.   Therefore, in order to preserve their security interests Defendants determined they would use all possible means to delay the Zohar Waterworks Action to ensure their respective security interest vested.

111.    Consequently, Defendants' litigation strategy was admittedly to bog the Zohar Waterworks Action down with unnecessary motions, filings, and other arguments in order to delay the proceedings until their security interests were perfected.   Once perfected, Defendants would be free to bankrupt Zohar Waterworks as the first priority creditor, to their personal benefit and to Plaintiffs' detriment.

112.   In employing the aggressive delay strategy, Defendants authorized their counsel to file abusive motions.

113.   The abusive motions included, but were not limited to, the following: (1) motions to add third parties, and, after denial of one of such motion, a Third-Party Complaint; (2) motions to stay the proceedings; (3) a motion for a jury trial (where the Agreements contained clear language waiving the right to a jury trial); and (4) multiple motions for extension of time, continuances and, noticeably, reconsideration of their respective motions once they were denied.   In addition to the written motions for reconsideration, repeated verbal requests for reconsideration were made at various hearings throughout the proceedings.

114.   Defendants even went so far as to direct counsel to find ways to obstruct, delay and frustrate each and every ruling in order to stay the Zohar Waterworks Action. Defendants' counsel therefore moved the state court to turn a non-appealable order into a final appealable order, which would have enabled Defendants to create an interlocutory appeal where no such rights existed.

115.   Defendants required findings of fact and conclusions of law for each individual stage of the litigation, which required the completion of court transcripts before drafts could be properly submitted for the state court's consideration.

116.   The delay tactics resulted in at least five different trial dates and at least five revised scheduling orders.

117.   Defendants successfully delayed the action because their security interests perfected before a judgment could be issued against Zohar Waterworks.

118.    Defendants substantially delayed the Zohar Waterworks Action for no other reason but to accomplish their ulterior motive.  Prior to a final judgment being rendered, Defendants took Zohar Waterworks into bankruptcy to avoid liability for their respective conduct and obtain personal financial gain.

119.    Indeed, the filing of the bankruptcy included an April 2, 2009 affidavit by Raul Tejada, Chief Operating and Financial Officer of Zohar Waterworks, where he swore under oath that the bankruptcy was motivated by the judgment in favor of Plaintiffs and noted that "a ruling regarding the exact amount of damages is expected shortly.  While the exact amount of the liability is not known, based on information currently available, the Marcus Adams [sic] has asserted liability in the amount of $8,811,306.10."

120.    Thus, according to the documents and filings in that case alone, the reason for the bankruptcy admittedly was Plaintiffs' imminent judgment and anticipated collection efforts against Zohar Waterworks.

121.    Plaintiffs were required to move the bankruptcy court to lift the automatic stay of the bankruptcy so that the state court could issue a judgment for Plaintiffs that could be filed against Zohar Waterworks in the bankruptcy action.  On May 18, 2009, the bankruptcy court granted Plaintiffs' motion and as anticipated, the trial court entered judgment in favor of Plaintiffs and against Zohar Waterworks on June 5, 2009.

122.    Defendants schemed to use the Zohar Waterworks bankruptcy process to cause claims of Zohar Waterworks against them to be transferred to them or to entities they control.  Notwithstanding Defendants' efforts to "game" the bankruptcy process to preserve their secured interests, gain control over potential claims adverse to their interests, and

frustrate Plaintiffs' imminent judgment against Zohar Waterworks, their efforts to avoid liability for their conduct was rejected when the Honorable Brendan L. Shannon of the U.S. Bankruptcy Court for the District of Delaware effectively ruled that any claims against Tilton, LD Investments, Patriarch Partners, Patriarch XIV, Zohar II, the John Doe Defendants and any related parties, including all Defendants, such as the claims in this Complaint, would not be released or assigned and are preserved.

## COUNT ONE – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

123.   Plaintiffs reallege and incorporate herein all of the preceding paragraphs of Plaintiffs' Second Amended Complaint as if rewritten herein.

124.   The Equipment Lease and the Building Leases were at all times in existence and enforceable contracts supported by consideration.   In fact, the Leases were declared valid and enforceable in the prior litigation between Zohar Waterworks and Plaintiffs.

125.   At all relevant times, Defendants Tilton, LD Investments, Patriarch Partners, Patriarch Management, Patriarch XIV, Zohar II, Harrington and/or the John Doe Defendants had actual knowledge of the terms and conditions of the Equipment Lease and the Building Leases.

126.   Defendants Tilton, LD Investments, Patriarch Partners, Patriarch Management, Patriarch XIV, Zohar II, the John Doe Defendants and Harrington knowingly and maliciously interfered with and prevented Zohar Waterworks from performing its obligations under the Equipment Lease and Building Leases by controlling Zohar Waterworks' actions and directing Zohar Waterworks not to perform its obligations under

those Leases when those Defendants knew that such action would result in a material breach of said Leases.

127.    Defendants intentionally and/or negligently interfered with and prevented Zohar Waterworks' performance of the Equipment Lease and Building Leases by ordering Zohar Waterworks not to perform under the Leases, including, but not limited to:   (a) directing Zohar Waterworks not to perform its obligations under Paragraph 7.1 and 7.4 of the Building Leases to repair and restore the Premises; (b) directing Zohar Waterworks not to perform its obligations under Paragraph 26 of the Equipment Lease to reasonably cooperate with the February 2007 auction; and (c) directing Zohar Waterworks to improperly and unlawfully convert and steal Plaintiffs' Equipment and transport it to Mexico in violation of Paragraphs 8 and 26 of the Equipment Lease.

128.    Defendants used wrongful means in breaching the Agreements and in interfering with the contractual relations of the parties, including, but not limited to, unlawfully converting and stealing Plaintiffs' equipment, resorting to acts of deception, lying, fraud, threats and economic duress.

129.    Defendants have utilized their control over Zohar Waterworks to further their personal interests rather than to encourage Zohar Waterworks to meet its own responsibilities and obligations under the Leases with Plaintiffs.  They exerted this control without regard to the potential or actual harm they were inflicting upon Zohar Waterworks.

130.    In directing Zohar Waterworks not to perform under the three respective Leases to gain an advantage over Plaintiffs, Defendants specifically intended to harm Plaintiffs and interfere with the Leases.

131.   Defendants had no lawful or legitimate justification for their procurement of Zohar Waterworks' breach of the Equipment Lease and the Building Leases.

132.   Plaintiffs have suffered and will continue to suffer actual damages, in an amount exceeding $1,000,000, as a direct and proximate result of the improper and unlawful conduct of Defendants.

133.   In interfering with the Leases at issue, Defendants acted knowingly, intentionally, with malice, and in conscious disregard of Plaintiffs' rights.   Accordingly, Plaintiffs are entitled to recover punitive damages in an amount to be determined at trial.

## COUNT TWO – FRAUD

134.   Plaintiffs reallege and incorporate herein all of the preceding paragraphs of Plaintiffs' Second Amended Complaint as if rewritten herein.

135.   At the time that the Building Leases were being negotiated by Tilton and Patriarch Partners, Defendants knew that Zohar Waterworks would not remain in the Premises for the lease-term and that Zohar Waterworks would not commit the necessary and contractually obligated resources to maintain and repair the Premises.

136.   Nevertheless, Defendants falsely and knowingly represented their intention to have Zohar Waterworks conduct the necessary repairs and maintain the Premises, as reflected in Paragraphs 7.1(a), 7.1(b) and 7.4(c) of the Building Leases.

137.   When they were negotiating the Equipment Lease, Defendants knew that Zohar Waterworks' operations would be moving Zohar Waterworks' operations to Mexico.

138.   Defendants knew that Zohar Waterworks required the use of the Equipment that was owned by MA Equipment, much of which was specifically designed for Zohar Waterworks' operations.

139.   Defendants knew that the Equipment Lease provided, amongst other things, that the Equipment was not to be removed from the Premises without Plaintiff MA Equipment's written consent (Paragraph 8 of the Equipment Lease) and that, at the termination of the Equipment Lease, Zohar Waterworks was required to purchase the Equipment for $3.5 million.   (Paragraph 25 of the Equipment Lease).

140.   At the time of the negotiation and execution of the Equipment Lease, Defendants had no intention of Zohar Waterworks performing its obligations under the Equipment Lease.   To the contrary, Tilton and Patriarch Partners directed Zohar Waterworks to move its operations to Mexico and to surreptitiously and systematically remove Plaintiff MA Equipment's Equipment without its consent, to insure that such move could not be delayed or disrupted.  Once that Equipment was moved to Mexico, Defendants anticipated that they would be able to renegotiate the Equipment Lease's terms, including, but not limited to, the buy-out amount for that Equipment.

141.   Defendants had no intention of allowing Zohar Waterworks to perform these critical terms of the Building Leases and Equipment Lease at the time the Leases were executed.

142.   Defendants feigned compliance with the Equipment Lease, and failed to inform MA Equipment that it had made the decision to transport equipment that belonged to MA Equipment to Mexico in the darkness of the night.

143.   Accordingly, Defendants' representations identified herein above were false at the time that they were made and Defendants knew that they were false at the time that they were made.

144. These representations were material to Plaintiffs' business relations with Defendants and were made by Tilton, Patriarch Partners and Harrington.

145. Defendants' representations and omissions were made with the intent of misleading Plaintiffs into relying upon them so that Defendants could move their operations out of this Country and to Mexico without having to make any investment in the Premises.

146. Plaintiffs were reasonably justified in relying on the representations of Tilton, Patriarch Partners and Harrington.

147. As noted above, Plaintiffs have suffered substantial damages proximately resulting from their reasonable reliance on Defendants' misrepresentations and/or omissions, including, but not limited, to compensatory damages in excess of $1,000,000, and are entitled to punitive damages in an amount to be proven at trial.

## COUNT THREE – SETTING ASIDE THE CORPORATE FORM AND BREACH OF CONTRACT

148. Plaintiffs reallege and incorporate herein all of the preceding paragraphs of Plaintiffs' Second Amended Complaint as if rewritten herein.

149. Tilton, Patriarch Partners, Patriarch XIV, Zohar II and the John Doe Defendants are either the primary funding source or in control of the funds for Zohar Waterworks.

150. Defendants have been conducting, managing, and controlling the affairs of Zohar Waterworks for their own personal benefit.

151. At all relevant times herein, Defendants exercised total dominion and control over Zohar Waterworks, and Defendants completely controlled the funding and

expenditures of Zohar Waterworks.   This dominion and control was so absolute and complete that Zohar Waterworks had no separate mind, will or existence of its own.

152.   Defendants intermingled their involvement and financial affairs with Zohar Waterworks such that Zohar Waterworks became their alter ego.

153.   In connection with their abuse of the corporate form of Zohar Waterworks and to improperly and unlawfully advance their own interests, Defendants exercised their control over Zohar Waterworks in such a manner as to commit numerous unlawful and illegal acts against Plaintiffs, including, but limited to, fraud, deceit, conversion, theft, threats and economic duress as outlined above.

154.   Defendants, through their actions and conduct outlined above, have knowingly and maliciously misused the corporate form to defraud and unjustly damage Plaintiffs in connection with the transactions and conduct described above, and therefore the corporate form of Zohar Waterworks should be set aside, with Defendants Tilton, Patriarch Partners, Patriarch XIV, Zohar II and/or the John Doe Defendants being held jointly and severally liable for the damages suffered by Plaintiffs for Zohar Waterworks' material breach of the Equipment Lease and the Building Leases in an amount not less than $7,000,000.00.

## COUNT FOUR – CIVIL CONSPIRACY

155.   Plaintiffs reallege and incorporate herein all of the preceding paragraphs of Plaintiffs' Second Amended Complaint as if rewritten herein.

156.   Defendants agreed, planned, and conspired to commit illegal acts and have taken acts in furtherance of the conspiracy, including breach of Zohar Waterworks' contractual duties to Plaintiffs and abuse of process in the Zohar Waterworks Action.

157.   Defendants Tilton, Patriarch Partners, Patriarch Management, Patriarch XIV, Zohar II, the John Doe Defendants and Harrington's actions have caused and will continue to cause Plaintiffs to suffer actual damages in an amount to be determined at trial and not less than an amount exceeding $1,000,000.00.

158.   Defendants acted knowingly, intentionally, with malice, and in conscious disregard of Plaintiffs' rights.   Accordingly, Plaintiffs are entitled to recover punitive damages in an amount to be determined at trial.

## COUNT FIVE – ABUSE OF PROCESS

159.   Plaintiffs reallege and incorporate herein all of the preceding paragraphs of Plaintiffs' Second Amended Complaint as if rewritten herein.

160.   On February 16, 2007, Plaintiff MA Equipment commenced the Zohar Waterworks Action.  On March 1, 2007, Plaintiff MA 265 joined as a proper party in that action.

161.   The Zohar Waterworks Action was in proper form and filed with probable cause.

162.   Defendants controlled and directed the litigation strategy in the Zohar Waterworks Action.

163.   Defendants inundated both Plaintiffs and the state court with repetitious and abusive motions all in an attempt to delay the proceedings.

164.   Defendants' intentions in filing these motions and claims were to delay the Zohar Waterworks Action until such time that their respective security interests became perfected.

165.   Defendants also filed such motions with malice and intent to damage and harm Plaintiffs.

166.   As a direct and proximate result of the contrived delay and strategy of Defendants herein, on the eve of a judgment in the Zohar Waterworks Action being issued against Zohar Waterworks, Defendants' security interests were perfected, protecting their personal investments in Zohar Waterworks. But for this strategic delay, their security interests would not have been perfected.

167.   Thus, the Zohar Waterworks Action was perverted by Defendants in order for them to achieve an ulterior purpose for which such action is not designed.

168.   Direct damage has resulted to Plaintiffs by Defendants' wrongful use of process.  Plaintiffs lost the ability to be on equal footing as an unsecured creditor in the Zohar Waterworks Bankruptcy with Defendants.

169.   Plaintiffs incurred attorneys' fees defending against the abusive and unnecessary motions, and Plaintiffs incurred attorneys' fees as a result of the Zohar Waterworks' Bankruptcy.

170.   Accordingly, Plaintiffs have been damaged in an amount to be determined at trial, in an amount not less than $1,000,000.00.

171.   Defendants acted knowingly, intentionally, with malice, and in conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to recover punitive damages in an amount to be determined at trial.

## COUNT SIX – NEGLIGENT MISREPRESENTATION

172.    Plaintiffs reallege and incorporate herein all of the preceding paragraphs of Plaintiffs' Second Amended Complaint as if rewritten herein.

173.    At the time that the Building Leases were being negotiated by Tilton, Robert Annas and Douglas Combs, the negotiators represented that Zohar Waterworks would remain in the Premises for the lease-term and represented that Zohar Waterworks would commit the necessary and contractually obligated resources to maintain and repair the Premises.

174.    Defendant Harrington similarly supplied misinformation regarding his communications with the auctioneer and the physical location of Plaintiff MA Equipment's equipment.

175.    The information provided by Defendants was false.

176.    Defendants supplied the information to Plaintiffs for guidance in their business transactions and Plaintiffs justifiably relied on the representations.

177.    Plaintiffs were harmed by Defendants representations, which caused pecuniary loss to Plaintiffs.

178.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the information.

179.    As noted above, Plaintiffs have suffered substantial damages proximately resulting from their reasonable reliance on Defendants' misrepresentations and/or omissions, including, but not limited, to compensatory damages in excess of $1,000,000.

**WHEREFORE**, Plaintiffs MA Equipment Leasing I LLC and MA 265 North Hamilton Road LLC demand judgment as follows:

A)     That Defendants Tilton, LD Investments, Patriarch Partners, Patriarch Management, Patriarch XIV, Zohar II, Harrington and John Doe Defendants jointly and severally, be ordered to pay compensatory damages in excess of $7,000,000;

B)     That Plaintiffs be awarded punitive damages not less than $25,000,000;

C)     That Plaintiffs be awarded attorneys' fees incurred as a result of Defendants' abuse of process;

D)     That Plaintiffs be awarded their reasonable attorneys' fees, prejudgment interest, expenses and costs incurred herein; and

E)     That Plaintiffs be granted such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury of the maximum number of jurors allowed, on all issues so triable.

Respectfully submitted,

/s/ Marc J. Kessler
Marc J. Kessler (0059236)
John F. Marsh (0065345)
Kerry R. Green (0075174)
Hahn Loeser & Parks LLP
65 East State Street, Suite 1400
Columbus, Ohio 43215
Telephone:  (614) 233-5102
Facsimile:  (614) 233-5107
mkessler@hahnlaw.com
jmarsh@hahnlaw.com
kgreen@hahnlaw.com

and

Daniel A. DeMarco (0038920)
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Telephone:  (216) 621-0150
Facsimile:  (216) 241-2824
ddemarco@hahnlaw.com

*Attorneys for Plaintiffs*